**FILED**

CR 10 - 343-RMC

DEC 2 1 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

WSA J.

庞贝捷漆油贸易(上海)有限公司
PPG PAINTS TRADING (SHANGHAI) CO., LTD.

RESOLUTIONS IN WRITING SIGNED BY ALL THE DIRECTORS FOR THE TIME BEING OF PPG PAINTS TRADING (SHANGHAI) CO., LTD. (庞贝捷漆油贸易(上海)有限公司) PURSUANT TO ITS ARTICLES OF ASSOCIATION

WHEREAS, the Directors of PPG Paints Trading (Shanghai) Co. Ltd. (the "Company") have determined that it is in the best interests of the Company and its investor to reach resolution with respect to the Company regarding the United States government's investigation into matters involving the Company in connection with certain sales of epoxy coatings;

NOW, THEREFORE, BE IT RESOLVED, that this Board authorizes and directs the Company to enter into a plea agreement with the United States Attorney's Office for the District of Columbia, as set forth in the attached Plea Agreement and Information (collectively, the "Plea Agreement");

BE IT FURTHER RESOLVED, that this Board authorizes Viktoras Rimas Sekmakas to execute the Plea Agreement and all other documents pertaining to the Plea Agreement on behalf of the Company, and to take such other actions as he deems necessary or advisable for the implementation of the foregoing resolution;

BE IT FURTHER RESOLVED, that this Board authorizes and directs Robert N. Driscoll of Alston & Bird LLP, as the Company's outside counsel, to act on its behalf for purposes of the Plea Agreement and to take such actions to execute such documents as he deems necessary or advisable for the implementation of the foregoing resolution.

Date:   December 20, 2010

Approved and signed by:

_____
Viktoras Rimas Sekmakas
*Chairman/Director*

_____
Michael Horton
*Director*

_____
Jonothan Bryan Kennedy
*Director*

- 1 -

**FILED**

DEC 2 1 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

CR10- 343-RMC

USA v. 庞贝捷漆油贸易(上海)有限公司
PPG PAINTS TRADING (SHANGHAI) CO., LTD.

RESOLUTIONS IN WRITING SIGNED BY ALL THE DIRECTORS FOR THE TIME BEING
OF PPG PAINTS TRADING (SHANGHAI) CO., LTD. (庞贝捷漆油贸易(上海)有限公
司) PURSUANT TO ITS ARTICLES OF ASSOCIATION

WHEREAS, the Directors of PPG Paints Trading (Shanghai) Co. Ltd. (the "Company") have
determined that it is in the best interests of the Company and its investor to reach resolution with
respect to the Company regarding the United States government's investigation into matters
involving the Company in connection with certain sales of epoxy coatings;

NOW, THEREFORE, BE IT RESOLVED, that this Board authorizes and directs the Company to
enter into a plea agreement with the United States Attorney's Office for the District of Columbia,
as set forth in the attached Plea Agreement and Information (collectively, the "Plea Agreement");

BE IT FURTHER RESOLVED, that this Board authorizes Viktoras Rimas Sekmakas to execute
the Plea Agreement and all other documents pertaining to the Plea Agreement on behalf
of the Company, and to take such other actions as he deems necessary or advisable for the
implementation of the foregoing resolution;

BE IT FURTHER RESOLVED, that this Board authorizes and directs Robert N. Driscoll of
Alston & Bird LLP, as the Company's outside counsel, to act on its behalf for purposes
of the Plea Agreement and to take such actions to execute such documents as he deems
necessary or advisable for the implementation of the foregoing resolution.

Date:   December 20, 2010

Approved and signed by:


_____
Viktoras Rimas Sekmakas
*Chairman/Director*

_____
Michael Horton
*Director*


_____
Jonothan Bryan Kennedy
*Director*

CERTIFICATE

I, Viktoras Rimas Sekmakas, chairman and director of PPG Paints Trading (Shanghai) Co. Ltd. (庞贝捷漆油贸易(上海)有限公司), hereby certify that the Board of Directors of PPG Paints Trading (Shanghai) Co. Ltd. adopted the following resolutions by way of a memorandum signed by all of its directors for the time being in accordance with its Articles of Association on December 20, 2010:

> WHEREAS, the Directors of PPG Paints Trading (Shanghai) Co. Ltd. (the "Company") have determined that it is in the best interests of the Company and its investor to reach resolution with respect to the Company regarding the United States government's investigation into matters involving the Company in connection with certain sales of epoxy coatings;

> NOW, THEREFORE, BE IT RESOLVED, that this Board authorizes and directs the Company to enter into a plea agreement with the United States Attorney's Office for the District of Columbia, as set forth in the attached Plea Agreement and Information (collectively, the "Plea Agreement");

> BE IT FURTHER RESOLVED, that this Board authorizes Viktoras Rimas Sekmakas to execute the Plea Agreement and all other documents pertaining to the Plea Agreement on behalf of the Company, and to take such other actions as he deems necessary or advisable for the implementation of the foregoing resolution;

> BE IT FURTHER RESOLVED, that this Board authorizes and directs Robert N. Driscoll of Alston & Bird LLP, as the Company's outside counsel, to act on its behalf for purposes of the Plea Agreement and to take such actions to execute such documents as he deems necessary or advisable for the implementation of the foregoing resolution.

Viktoras Rimas Sekmakas
Director

State/Commonwealth of _Pennsylvania_

City/County of _Allegheny_

The foregoing certificate was acknowledged before me on this _20_ day of December, 2010, by Viktoras Rimas Sekmakas.

Notary Public
My commission expires on _6-15-12_.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Joan E. Goyke, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires June 15, 2012
Member, Pennsylvania Association of Notaries

CR 10-343-RMC

**FILED**

DEC 2 1 2010

USA V.

庞贝捷漆油贸易(上海)有限公司
PPG PAINTS TRADING (SHANGHAI) CO., LTD.

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**RESOLUTIONS IN WRITING SIGNED BY ALL THE DIRECTORS FOR THE TIME BEING OF PPG PAINTS TRADING (SHANGHAI) CO., LTD. (庞贝捷漆油贸易(上海)有限公司) PURSUANT TO ITS ARTICLES OF ASSOCIATION**

WHEREAS, the Directors of PPG Paints Trading (Shanghai) Co. Ltd. (the "Company") have determined that it is in the best interests of the Company and its investor to reach resolution with respect to the Company regarding the United States government's investigation into matters involving the Company in connection with certain sales of epoxy coatings;

NOW, THEREFORE, BE IT RESOLVED, that this Board authorizes and directs the Company to enter into a plea agreement with the United States Attorney's Office for the District of Columbia, as set forth in the attached Plea Agreement and Information (collectively, the "Plea Agreement");

BE IT FURTHER RESOLVED, that this Board authorizes Viktoras Rimas Sekmakas to execute the Plea Agreement and all other documents pertaining to the Plea Agreement on behalf of the Company, and to take such other actions as he deems necessary or advisable for the implementation of the foregoing resolution;

BE IT FURTHER RESOLVED, that this Board authorizes and directs Robert N. Driscoll of Alston & Bird LLP, as the Company's outside counsel, to act on its behalf for purposes of the Plea Agreement and to take such actions to execute such documents as he deems necessary or advisable for the implementation of the foregoing resolution.

Date:    December 20, 2010

Approved and signed by:

_____
Viktoras Rimas Sekmakas
*Chairman/Director*

_____
Michael Horton
*Director*

_____
Jonothan Bryan Kennedy
*Director*

- 1 -

U.S. Department of Justice

Ronald C. Machen Jr
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

December ___, 2010

Robert N. Driscoll, Esq.
Kenneth G. Weigel, Esq.
Alston & Bird
The Atlantic Building
950 F Street, N.W.
Washington, D.C. 20004-1404

Re: PPG Paints Trading (Shanghai) Co., Ltd. Plea Offer

Dear Messrs. Driscoll and Weigel:

This letter sets forth the full and complete plea offer to your client, PPG Paints Trading (Shanghai) Co., Ltd. ("PPG PAINTS TRADING"), from the United States Attorney's Office for the District of Columbia ("USAO-DC" or "the Government"). If your client accepts the terms and conditions of this offer, both an authorized representative of your client and you should execute this document in the spaces provided below and return the original document to us. Please include a notarized copy of the resolution of the Board of Directors of PPG PAINTS TRADING which states that your client has authorized this Plea Agreement and has empowered you as its outside counsel to act on its behalf for purposes of this plea. Upon our receipt of the executed document (along with the aforementioned board resolution), this letter will become the plea agreement ("Plea Agreement"). The signed Plea Agreement **must be filed** with the United States District Court for the District of Columbia **on or before December 31, 2010**, or the entire Plea Agreement will become null and void.

The terms of the USAO-DC's plea offer are as follows:

## 1.   Charges

Your client agrees to waive indictment and enter a plea of guilty to a four-count criminal Information, which will be filed in the United States District Court for the District of Columbia. A copy of the Information is attached. The Information charges your client with, in Count One, conspiring to violate the International Economic Powers Act ("IEEPA") and Export Administration Regulations ("EAR"), in violation of 18 U.S.C. § 371, and in Counts II-IV, three substantive violations of IEEPA, 50 U.S.C. § 1705, and the Export Administration Regulations ("EAR"), 15 C.F.R. § 764.2.

Your client agrees to appear before the Court through an authorized representative and to admit its guilt to the offenses charged in the Information, accept the attached Factual Proffer in Support of Guilty Plea as the basis for its admission of guilt, and admit these facts when its plea is entered before the Court.

## 2.   Potential Penalties, Restitution and Assessments

Your client, as a corporate violator, understands that, pursuant to 18 U.S.C. § 3571(c)(3), the maximum penalty could be (a) a criminal fine of $500,000 for each of these charges; (b) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (c) twice the gross amount of any pecuniary loss sustained by any victims of the offense. See 18 U.S.C. § 3571. Your client is would also be subject to a term of corporate probation of up to five years pursuant to 18 U.S.C. § 3561. The Court may also order restitution pursuant to 18 U.S.C. § 3663. Fines imposed by the Court may be subject to the payment of interest. In addition, the Court will order your client to pay a mandatory special assessment of $400 per count (for a total of $1600) to the Clerk of the United States District Court, such assessment payable prior to sentencing. See 18 U.S.C. § 3013.

## 3.   Sentencing Guidelines Stipulations

The parties agree that your client's sentence is not governed by the United States Sentencing Guidelines (hereinafter "Guidelines" or "U.S.S.G."). That is because, although the offense conduct to which your client is pleading guilty is covered by U.S.S.G. § 2M5.1(a), that Guideline is not listed under U.S.S.G. § 8C2.10, which governs fines for organizations. Accordingly, pursuant to U.S.S.G. § 8C2.10, the sentence is to be determined by applying 18 U.S.C. §§ 3553 and 3572.

## 4.   Additional Charges

In consideration and as an express condition of this corporate plea agreement, no additional criminal charges shall be filed against PPG PAINTS TRADING, its subsidiaries, or successors-in-interest by the United States Attorney's Office for the District of Columbia with regard to any conduct described in the accompanying written factual proffer. This Plea

2

Agreement solely concerns the parties to this agreement and no other individuals, companies, or agencies.  This Plea Agreement provides no immunity or protection, in any manner, for individuals from any future criminal investigation or prosecution.

5.      **Plea Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C)**

Pursuant to Federal Rule of Criminal Procedure (F.R.Cr.P.) 11(c)(1)(C), your client and the Government agree that a criminal fine of $2,000,000 ($500,000 for each count) and corporate probation of five years is the appropriate sentence for the charges to which your client is pleading guilty.  The parties agree that $2,000,000 is the appropriate criminal fine in resolution of this matter, taking into account the inapplicability of the Guidelines, the nature and circumstances of the offense, and the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes.  18 U.S.C. § 3553(a)(1).  The criminal fine shall be paid by cashier's check or certified check made payable to: "Clerk, United States District Court for the District of Columbia."  Your client agrees to fully satisfy this criminal fine on or before the date of the sentencing hearing in this matter.

Your client agrees that no portion of the $2,000,000 that your client has agreed to pay under the terms of this agreement is deductible on any Federal, State, or foreign tax or information return.

Your client further agrees to the entry of a forfeiture monetary judgment of $32,319 against it, as discussed in paragraph six of this Plea Agreement.

In addition to any other conditions of probation that the United States Probation Office may propose and/or the Court may impose, your client and the Government further agree that the following conditions of corporate probation are appropriate in this case and your client agrees to abide by them:

(a)      Your client shall pay the sum set forth in this Plea Agreement.

(b)      Your client shall not commit any federal, state, or local crimes during the term of probation.

(c)      Your client shall implement and maintain an effective corporate ethics program and export compliance program that fully comports with the criteria set forth in U.S.S.G. § 8B2, including, at a minimum:

(i)      Ensuring that a specific employee of your client remains assigned with overall responsibility for implementation of PPG Industries' ethics program and export compliance policies, controls, and procedures at PPG

3

PAINTS TRADING, and ensuring that that employee reports directly to PPG Industries' Chief Compliance Officer no less frequently than on an semi-annual basis on the implementation and effectiveness of the ethics and export compliance program at PPG PAINTS TRADING.

(ii)     Requiring all directors, officers, and employees, of PPG PAINTS TRADING, to report to PPG Industries any suspected or actual violations of any U.S. export control laws or regulations, of PPG Industries' export compliance policies, controls, or procedures, or of PPG Industries' ethics policy related to such export compliance policies, controls, or procedures, to the extent such suspected or actual violations involve PPG Industries or its subsidiaries, including PPG PAINTS TRADING, and where legally permissible.

(iii)    Directing, to the extent that their respective business relationships with PPG PAINTS TRADING can reasonably be expected to implicate export control issues, and as appropriate for their respective jobs or business functions, agents, consultants, representatives, distributors, joint venture partners, and business partners of PPG PAINTS TRADING, to report to PPG Industries any suspected or actual violations of any U.S. export control laws or regulations, to the extent such suspected or actual violations involve items or employees of PPG Industries or its subsidiaries, including PPG PAINTS TRADING, and where legally permissible.

(iv)     Implementing an effective system for internal reporting of suspected or actual violations of any U.S. export control laws or regulations, of PPG Industries' export compliance policies, controls or procedures, or of PPG Industries' ethics policy related to such export compliance policies, controls, or procedures, including, to the extent and where legally permissible, a confidential, anonymous "hotline" and e-mail address, of which your client's directors, officers, employees, agents and business partners are informed and can use to notify PPG Industries of any suspected or actual violations of any U.S. export control laws or regulations, of PPG Industries' export compliance policies, controls or procedures, or of PPG Industries' ethics policy related to such export compliance policies, controls, or procedures.

(v)      Mandatory annual corporate ethics and export control training of all directors, officers and, as appropriate for job function, employees of PPG PAINTS TRADING. Such training shall cover, at a minimum, (A) all relevant U.S. export control laws and regulations; (B) PPG Industries' ethics policy; (C) PPG Industries' export compliance policies, controls,

4

and procedures, including recordkeeping requirements; (D) the obligations assumed by, and responses expected of directors, officers, and employees of PPG PAINTS TRADING, upon learning of any suspected or actual violations of any U.S. export control laws and regulations, of PPG Industries' export compliance policies, controls, or procedures, or of PPG Industries' ethics policy related to such export compliance policies, controls, or procedures. To the extent that it has not already done so, PPG PAINTS TRADING shall commence providing this training within ninety (90) calendar days after the execution of this Cooperation and Non-Prosecution Agreement.

(vi)     Informing, to the extent that their respective business relationships with PPG PAINTS TRADING can reasonably be expected to implicate export control issues and as appropriate for their respective jobs or business functions, agents, consultants, representatives, distributors, joint venture partners, and business partners of PPG PAINTS TRADING, and its subsidiaries, of their obligation to comply with U.S. export control laws and regulations and of their obligations under PPG Industries' export compliance policies, controls, or procedures, as related to their respective business relationships with PPG PAINTS TRADING. To the extent that it has not already done so, PPG PAINTS TRADING shall commence providing such individuals and entities with this information within one-hundred eighty (180) calendar days after the execution of this Cooperation and Non-Prosecution Agreement.

(vii)    An effective written system of discipline for your client's directors, officers, employees, agents and business partners who are found to have violated any U.S. export controls laws and regulations, PPG Industries' export compliance policies, controls, or procedures, or PPG Industries' ethics policy related to such export compliance policies, controls, or procedures.

(viii)   Prompt written notification by your client to the USAO-DC and the Department of Commerce's Bureau of Industry and Security ("BIS") of any known criminal investigations of any type of itself or its officers or directors. In addition, your client shall promptly notify the USAO-DC and BIS in writing of any credible evidence of possible criminal conduct relating to any suspected or actual violations or attempted violations of any U.S. export control laws or regulations by your client or its officers, directors, employees, agents or business partners. At the request of the USAO-DC, your client shall provide the USAO-DC and BIS with all relevant non-privileged documents and information concerning such allegations, including but not limited to internal audit reports,

"whistleblower" complaints, civil complaints, and documents produced in civil litigation. In addition, to the extent PPG PAINTS TRADING has an obligation to notify the USAO-DC and BIS pursuant to this subsection, your client shall report to the USAO-DC and BIS its planned investigative measures and any resulting remedial measures, internal and external, as a result of any suspected or actual violations of any U.S. export control laws or regulations.

Your client also agrees that it will provide a complete copy of the audit reports required under Administrative Agreement to the USAO-DC at the same time those reports are provided to BIS. Your client agrees that the USAO-DC may disclose the audit reports to any other federal law enforcement or regulatory agency in furtherance of an investigation of any other matters discovered by, or brought to the attention of, the USAO-DC. Your client may identify any trade secret or proprietary information contained in the audit reports and request that the information be redacted prior to disclosure.

The Government also agrees, pursuant to F.R.Cr.P. 11(c)(1)(C), to present this Plea Agreement between the parties to the Court for its approval. If the Court accepts the Plea Agreement and the specific sentence agreed upon by the parties, then the Court will embody in the judgment and sentence the disposition provided for in this Plea Agreement, pursuant to F.R.Cr.P. 11(c)(4). The parties understand, however, that in light of other factors the Court may not agree that such a sentence is an appropriate one and may reject the plea agreement pursuant to F.R.Cr.P. 11(c)(5). Your client understands that, if this happens, the Court, in accordance with the requirements of F.R.Cr.P. 11(c)(5), will inform the parties of its rejection of the Plea Agreement and will afford your client an opportunity to withdraw the plea, or if your client persists in the guilty plea will inform your client that a final disposition may be less favorable to your client than that contemplated by this Plea Agreement. Your client further understands that if the Court rejects the Plea Agreement, the Government also has the right to withdraw from the Plea Agreement and to be freed from all obligations under the Plea Agreement, and may, in its sole discretion, bring different or additional charges against your client.

Further, if the Court rejects the Plea Agreement, and your client withdraws its guilty plea under F.R.Cr.P. 11(c)(5) and (d), this Plea Agreement, the guilty plea, and any statement made in the course of any proceedings under F.R.Cr.P. 11 regarding the guilty plea or this Plea Agreement, or made in the course of plea discussions with the USAO-DC, shall not be admissible against your client in any criminal or civil proceeding, except as otherwise provided in Federal Rule of Evidence (F.R.E.) 410. In addition, your client agrees that if it withdraws its guilty plea pursuant to this subparagraph of this Plea Agreement, the statute of limitations period for any offense referred to in this Plea Agreement will be tolled for a period of six months from the date of your client's withdraw of its guilty plea.

6

6.     **Forfeiture Matters**

Your client agrees to the forfeiture set forth in the Forfeiture Allegation in the Criminal Information to which he is pleading guilty. Specifically, your client agrees to the forfeiture of a money judgment in the amount of $32,319. Your client agrees to fully satisfy this money judgment on or before the date of the sentencing hearing in this matter.

Your client agrees that the Statement of Offense supporting your client's guilty plea is sufficient evidence to support this forfeiture. Your client agrees that the Court may enter a preliminary Consent Order of Forfeiture for this property at the time of its guilty plea or at any time before sentencing. Your client agrees that the Court will enter a Final Order of Forfeiture for this property as part of its sentence.

Your client agrees that this Plea Agreement permits the government to seek to forfeit any of its assets, real or personal, that are subject to forfeiture under any federal statute, even though this Plea Agreement does not specifically identify such an asset. Regarding any asset or property not identified specifically in this Plea Agreement, your client agrees to forfeiture of all interest in: (1) any and all property constituting, or derived from, any proceeds it obtained, directly or indirectly, as the result of the violation to which it is pleading guilty, and (2) any substitute assets for property otherwise subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853; and 28 U.S.C. § 2461(c).

By this Plea Agreement, your client agrees that it has waived any and all interest it has in these assets or properties and consented to their forfeiture by whatever process the Government chooses. Your client agrees that the Government may use this waiver and consent in any administrative or judicial forfeiture proceeding, whether criminal or civil, state, local or federal. If your client already has filed a claim to any of these assets or property in any forfeiture process, it hereby agrees to withdraw it. It also agrees that it will not file a claim to any of these assets or property in any future forfeiture proceeding of whatever type.

Your client agrees that the Government may choose in its sole discretion how it wishes to accomplish forfeiture of the property whose forfeiture it has consented to in this Plea Agreement, whether by criminal or civil forfeiture, using judicial or non-judicial forfeiture processes. If the Government chooses to effect the forfeiture provisions of this Plea Agreement through the criminal forfeiture process, your client agrees to the entry of orders of forfeiture for such property and waives the requirements of F.R.Cr.P. 32.2 regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Your client understands that the forfeiture of assets is part of the sentence that may be imposed in this case, and it waives any failure by the Court to advise him of this, pursuant to F.R.Cr.P. 11(b)(1)(J), at the time of its guilty plea.

Your client agrees to take all necessary actions to identify all assets over which your client exercises or exercised control, directly or indirectly, at any time since January 1, 2006, or

7

in which your client has or had during that time any financial interest. Your client agrees to take all steps as requested by the Government to obtain from any other parties, by any lawful means, any records of assets owned at any time by your client. Your client agrees to provide and/or consent to the release of your client's tax returns for the previous five years. Your client agrees to forfeit to the United States all of your client's interests in any asset of a value of more than $1,000 that, since January 1, 2006, your client owned, or in which your client maintained an interest. Your client agrees to take all steps as requested by the Government to pass clear title to forfeitable interests or to property to the United States and to testify truthfully in any judicial forfeiture proceeding.

Your client agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, *habeas corpus*, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

### 7.   Cooperation with the Government

Your client agrees to cooperate fully, completely, and truthfully with all investigators and attorneys of the government, by truthfully providing all information in your client's possession relating directly or indirectly to all criminal activity and related matters which concern the subject matter of this investigation, including but not limited to the conduct set forth in the Information and the Factual Proffer. Your client's cooperation shall include, but not be limited to:

(a)   responding fully and truthfully to the requests of the USAO-DC, BIS, or any other law enforcement agency designated by the USAO-DC, to investigate and prosecute the related to the subject matter of the USAO-DC's investigation, including but not limited to the conduct set forth in the Information and Statement of Facts;

(b)   upon request, producing to the USAO-DC all non-privileged documents, information, and other materials (with translations in English), wherever located, in the possession, custody, or control of your client, its subsidiaries, affiliates or successors-in-interest;

(c)   upon request, identifying witnesses who, to your client's knowledge, may have material non-privileged information related to the subject matter of the USAO-DC's investigation, including but not limited to the conduct set forth in the Information and Statement of Facts;

(d)   upon request, using its best efforts promptly to secure the attendance and truthful statements or testimony of any of its present or former officers, directors, employees, agents, consultants or independent contractors as requested by the USAO-DC at any meeting or interview, or for appearance before the grand jury, trial or other court proceeding;

8

        (e)     upon request, assisting the USAO-DC by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding;

        (f)     upon request, providing all non-privileged information, documents, records, or other tangible evidence related to the subject matter of the USAO-DC's investigation, including but not limited to the conduct set forth in the Information and Statement of Facts;

        (g)     upon request, providing a detailed privilege log for those documents, records, or other evidence requested but withheld under a claim of privilege; and

        (h)     upon request, providing testimony, certifications, qualified custodians of records, and other non-privileged information deemed necessary by the USAO-DC or a court to identify, establish the original location of, or authenticate and introduce into evidence in any criminal proceeding, documents, records and tangible evidence produced by your client, its subsidiaries, affiliates or successors-in-interest, or its directors, officers, employees, agents, consultants, representatives, or distributors.

Your client acknowledges that it has been advised that, regardless of the extent of its cooperation, the United States will seek no downward departures from the applicable sentencing guidelines, pursuant to U.S.S.G. § 5K, or pursuant to F.R.Cr.P. 35(b), from the sentence imposed by the Court. Rather, it is the position of your client and the Government that your client be sentenced under F.R.Cr.P. 11(c)(1)(C) consistent with the terms of paragraph five of this Plea Agreement.

### 8.    Reservation of Allocution

Your client understands that the Government reserves the right to describe fully, both orally and in writing, to the sentencing judge the nature and seriousness of your client's misconduct, including misconduct not described in the charges to which your client is pleading guilty. Both parties reserve the right to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this plea agreement.

### 9.    Waiver of Rights

Your client understands that by pleading guilty in this case, your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute, including the right to be indicted by a grand jury, the right to plead not guilty and the right to a jury trial. At a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, and to compel witnesses to appear to testify and present other evidence on your client's behalf. If your client chose not to testify at a jury trial, your client would have the right to have the jury instructed that your client's failure to testify could

not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal the conviction. Your client understands that, by pleading guilty, your client is waiving each of these rights.

Your client also knowingly waives all challenges to venue or jurisdiction in the District of Columbia.

## 10.   **Breach of Agreement**

Your client understands and agrees that, if your client fails specifically to perform or to fulfill each and every one of your client's obligations under this Plea Agreement, or commits any further crimes, your client will have breached this Plea Agreement. In the event of such a breach, (a) the Government will be free from its obligations under the agreement; (b) your client will not have the right to withdraw its guilty plea; (c) your client shall be fully subject to criminal prosecution for any other crimes that your client has committed or might commit, if any, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding all statements made by your client and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Plea Agreement or during the course of any debriefings conducted in anticipation of, or after entry of this Plea Agreement, including your client's statements made during proceedings before the Court pursuant to F.R.Cr.P. 11.

Your client acknowledges discussing with you F.R.Cr.P. 11(f) and F.R.E.410, rules that ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights that arise under these rules. As a result of this waiver, your clients understand and agree that any statements that are made in the course of your client's guilty plea or in connection with your client's cooperation pursuant to this Plea Agreement will be admissible against your client for any purpose in any criminal or civil proceeding if your client breaches this Plea Agreement or your client's guilty plea is subsequently withdrawn.

Moreover, in the event that your client's guilty plea is withdrawn, your client agrees that the Government will be free to use against your client in any criminal or civil proceeding any statements made during the course of any debriefings conducted in this case, regardless of whether those debriefings were previously covered by an earlier "off the record" agreement by the parties.

If your client breaches this Plea Agreement, any prosecution of your client not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against your client in accordance with this paragraph, notwithstanding the running of the statute of limitations before the commencement of such prosecutions. Your client

10

knowingly and voluntarily agrees to waive any and all defenses based on any statute of limitations for any prosecution commenced pursuant to the provisions of this paragraph.

Your client understands and agrees that the Government shall be required to prove a breach of this Plea Agreement only by a preponderance of the evidence. Your client further understands and agrees that the Government need only prove a violation of federal, state, or local criminal law by preponderance of the evidence in order to establish a breach of this Plea Agreement.

Nothing in this Plea Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Plea Agreement or committed by your client after the execution of this Plea Agreement. Your client understands and agrees that the Government reserves the right to prosecute it for any such offenses. Your client further understands that any perjury, false statements, or declarations, or obstruction of justice relating to your client's obligations under this Plea Agreement shall constitute a breach of this Plea Agreement. However, in the event of such a breach, your client will not be allowed to withdraw its guilty plea.

## 11.    Appeal Waiver

It is agreed that (a) your client will not file an appeal of any sentence imposed pursuant to this Plea Agreement, including but not limited to, the imposition of the criminal fine agreed upon by the parties as set forth above, and (b) the Government will not appeal any sentence imposed pursuant to this Plea Agreement.

## 12.    Prosecution by Other Agencies or Jurisdictions

This Plea Agreement binds only the USAO-DC. It does not bind any other United States Attorney's Office or any other office or agency of the United States government, including, but not limited to, the Tax Division of the United States Department of Justice; the Internal Revenue Service of the United States Department of the Treasury; or any state or local prosecutor. These individuals and agencies remain free to prosecute your client for any offense(s) committed within their respective jurisdictions. The USAO-DC agrees to contact any prosecuting jurisdiction and advise that jurisdiction of the terms of this Plea Agreement and the cooperation, if any, provided by your client.

## 13.    No Other Agreements

No other agreements, promises, understandings, or representations have been made by the parties other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, your client's counsel, and an Assistant United States Attorney for the District of Columbia, or made by the parties on the record before the Court.

11

If your client agrees to the conditions set forth in this letter, both your client and you should sign the original in the spaces provided below and return the executed Plea Agreement to us. The original of this Plea Agreement will be filed with the Court.

This Plea Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement. Facsimile or electronically submitted signatures are acceptable, binding signatures for purposes of this Plea Agreement.

Very truly yours,

RONALD C. MACHEN JR.
Acting United States Attorney

G. MICHAEL HARVEY
JOHN BORCHERT
Assistant United States Attorneys
National Security Section

12

## DEFENDANT'S ACCEPTANCE

I am authorized to act on behalf of PPG Paints Trading (Shanghai) Co., Ltd. in this matter.

I have read this Plea Agreement and have discussed it with the corporation's attorney, Robert N. Driscoll and Kenneth G. Weigel. I am fully satisfied with the legal services provided by Mr. Driscoll and Mr. Weigel. I understand this Plea Agreement and voluntarily agree to it. No threats have been made to me or PPG Paints Trading (Shanghai) Co., Ltd., nor am I under the influence of anything that could impede my ability to understand this Plea Agreement fully. No promises, agreements, understandings, or conditions have been made or entered into except those set forth in this Plea Agreement.

Date: _____

_____
VIKTORAS RIMAS SEKMAKAS
Director
PPG Paints Trading (Shanghai) Co., Ltd.


## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this Plea Agreement, reviewed them with my client, and discussed the provisions of the Plea Agreement with my client, fully. These pages accurately and completely set forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Plea Agreement.

Date: _____

_____
ROBERT N. DRISCOLL, ESQ.
Attorney for PPG Paints Trading (Shanghai) Co., Ltd.

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. _____ |
| ) | |
| ) | VIOLATIONS: |
| ) | |
| v. ) | 18 U.S.C. § 371 |
| ) | (Conspiracy) |
| ) | |
| PPG PAINTS TRADING (SHANGHAI) CO., ) | 50 U.S.C. § 1705 |
| LTD. ) | (International Emergency |
| ) | Economic Powers Act) |
| Defendant. ) | |
| ) | 15 C.F.R. Parts 730–774 |
| ) | (Export Administration |
| ) | Regulations) |
| ) | |
| ) | 18 U.S.C. § 2 |
| ) | (Causing an Act to Be Done) |
| ) | |
| ) | 18 U.S.C. § 981(a)(1)(C) |
| ) | 28 U.S.C. § 2461(c) |
| ) | (Criminal Forfeiture) |

## INFORMATION

The United States Attorney charges that:

## COUNT ONE

At all times material to this Information:

## INTRODUCTION

1.     PPG Industries, Inc. ("PPG Industries"), was a publicly-held United States

corporation with its principal place of business and headquarters in Pittsburgh, Pennsylvania.

PPG Industries was a major global manufacturer and supplier of chemicals, glass, fiberglass, and

architectural, industrial and performance coatings.

1

2.      Defendant PPG PAINTS TRADING (SHANGHAI) CO., LTD. ("PPG
PAINTS TRADING"), a wholly-owned subsidiary of PPG Industries, was a Chinese
corporation with its principal place of business in Shanghai, China.   Defendant PPG PAINTS
TRADING was engaged in the business of   importing and exporting architectural, refinish,
industrial and packaging coatings on behalf of various PPG Industries business units.

3.      The United States Department of Commerce ("DOC"), located in the District of
Columbia, was responsible for reviewing and controlling the export of certain goods and
technologies from the United States to foreign countries and entities.   The Export
Administration Act ("EAA"), 50 U.S.C. App. §§ 2401-2420, authorized the DOC to prohibit or
curtail the export of goods and technology from the United States as necessary to protect, among
other things, the national security of the United States.   The DOC implemented that authority
through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774.   Although
the EAA was lapsed during the conduct at issue, at all time relevant to this Information, the EAR
continued to be in effect under the provisions of the International Emergency Economic Powers
Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, by virtue of Executive Order 13222 (August 17, 2001),
as extended by successive Presidential notices.

4.      Through the EAR, the DOC authorized the exportation of goods and technology
to restricted countries and foreign end-users through the issuance of a license.   Any export,
reexport, or transshipment of goods from the United States to a restricted country or foreign
end-user without such a license was a violation of the EAR.

5.      Section 734.2(b)(1) of the EAR defined "export" to mean, in pertinent part, an
actual shipment or transmission of items subject to the EAR out of the United States.   Section

2

734.2(b)(4) of the EAR defined "reexport" to mean, in pertinent part, the actual shipment or transmission of items subject to the EAR from one foreign country to another foreign country. Section 734.2(b)(6) of the EAR provided that, for purposes of the EAR, the export or reexport of items subject to the EAR that will transit through a country or countries, or be transshipped in a country or countries to a new country, or are intended for reexport to the new country, are deemed to be exports to the new country.

  6.  Under Part 764 of the EAR:

    a.  Part 764.2(b) provided that no person may cause or aid, abet, counsel, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder.   15 C.F.R. Part 746.2(b).

    b.  Part 764.2(c) provided that no person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder. 15 C.F.R. Part 746.2(c).

    c.  Part 764.2(e) provided that no person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any item exported or to be exported from the United States, or that was otherwise subject to the EAR, with knowledge that a violation of the EAA, the EAR, or any order, license or authorization issued thereunder, has occurred, was about to occur, or was intended to occur in connection with the item.   15 C.F.R. Part 764.2(e).

3

7.      DOC's Bureau of Industry and Security ("BIS") published a list of   prohibited individuals or entities (the "Entity List") found in Supplement No. 4 to Part 744 of the EAR. Individuals or entities were placed on the Entity List by BIS because they had engaged in activities that could result in an increased risk of diversion of exported, reexported and transferred items to weapons of mass destruction programs, to activities sanctioned by the State Department, or to activities contrary to United States national security and/or foreign policy interests.

8.      The Pakistan Atomic Energy Commission ("PAEC") was the science and technology organization in Pakistan responsible for, among other things, Pakistan's nuclear program, including the development and operation of nuclear power plants in Pakistan.

9.      In or about November 1998, following Pakistan's first successful detonation of a nuclear device, BIS added the PAEC, as well as the PAEC's subordinate nuclear reactors and power plants, to the Entity List.   As a restricted end-user, a United States manufacturer seeking to export, reexport or tranship any items subject to the EAR to the PAEC or its nuclear reactors and power plants would need first to obtain a license from DOC in the District of Columbia.

10.     In 2006, the Chashma Nuclear Power Plant 2 ("Chashma 2") was a PAEC nuclear power plant under construction near Kundian, Punjab province, Pakistan.   Because it is a PAEC nuclear power plant, export, reexport or transshipment of any items subject to the EAR to Chashma 2 would require a license from the DOC.

11.     The conduct alleged in this Count began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and

4

is therefore within the venue of the United States District of Court for the District of Columbia
pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

12.     Company A was a Chinese construction company specializing in overseas nuclear
and civil engineering project management.   Company A was the general contractor responsible
for the construction of Chashma 2 for the PAEC.

13.     Company B was a Chinese construction company specializing in nuclear
engineering, municipal engineering, fire engineering, road engineering, and steel structure
engineering.   Company B was a subcontractor working for Company A on the construction of
Chasma 2.   Company B was responsible for applying coatings at Chashma 2.

14.     Company C was a Chinese distributor of coatings located in Shanghai, China.

15.     At one of its factories in Watertown, Connecticut, PPG Industries manufactured a
high-performance paint system that was tested and certified for use inside a nuclear reactor.
The paint system include a two-part epoxy base coat (product codes KL65487107A and
KL65487107B), a two-part epoxy top coat (product code KLD19140 and KLD1B), and a thinner,
or solvent (product code KL4093) (together, "the Coatings").   The Coatings were items subject
to the EAR, were classified EAR99, and fell within the jurisdiction of the DOC.

16.     In or about December 2005, defendant **PPG PAINTS TRADING** entered a
contract with Company B for defendant **PPG PAINTS TRADING** to supply the Coatings for
application by Company B at Chashma 2 ("Chashma 2 Contract").

17.     Because Chashma 2 was a PAEC nuclear power plant, on or about January 20,
2006, PPG Industries submitted a license application to DOC in the District of Columbia for

5

authorization to export the Coatings for application at Chashma 2.   **PPG PAINTS TRADING**
was involved in the preparation of the license application.

18.     On or about June 8, 2006, PPG Industries was informed that its license application
would be denied by DOC.

19.     On or about June 9, 2006, PPG Industries notified defendant **PPG PAINTS
TRADING** that it must abide by the ruling of the DOC denying the license and instructed
defendant **PPG PAINTS TRADING** to advise Company B that it could not provide the Coatings
to Company B.

20.     In response, on or about June 9, 2006, defendant **PPG PAINTS TRADING**
informed PPG Industries that it had informed Company B that it could not provide the Coatings.

21.     At no time did the defendant **PPG PAINTS TRADING** receive or possess a
license or authorization from the DOC to export, reexport or transship the Coatings from the
United States to Chashma 2.

### The Conspiracy

22.     Beginning in or about June 2006, and continuing through in or about March 2007,
within the District of Columbia and elsewhere, defendant **PPG PAINTS TRADING** did
knowingly and willfully combine, conspire, confederate, and agree with others known and
unknown to commit offenses against the United States, that is, (a) to violate the IEEPA and the
EAR by causing the Coatings, which **PPG PAINTS TRADING** knew were destined for
Chashma 2, a PAEC nuclear power plant, to be exported, reexported, and transshipped from the
United States to Chashma 2 in Pakistan, via the People's Republic of China, without first
obtaining the required license from the Department of Commerce, located in the District of

6

Columbia; and (b) to defraud the Department of Commerce and the United States government by interfering with and obstructing a lawful government function, that is, promulgation of laws and regulations prohibiting the export, reexport or transshipment of goods from the United States to Chashma 2, a PAEC nuclear power plant without a license, by deceit, craft, trickery, and dishonest means, all in violation of Title 18, United States Code, Section 371.

**Objects of the Conspiracy**

23.     The objects of the conspiracy were:

   a.     to make money for defendant **PPG PAINTS TRADING** and its co-conspirators;

   b.     to supply the Coatings for application at Chashma 2 thereby avoiding breach of the Chashma 2 Contract;

   c.     to conceal the true end-user of the Coatings from detection by the United States; and

   d.     to evade the prohibitions and licensing requirements of the IEEPA and the EAR.

**Manner and Means of the Conspiracy**

24.     The manner and means by which the defendant **PPG PAINTS TRADING** and its co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

   a.     Defendant **PPG PAINTS TRADING** and other conspirators began planning and acting outside of the United States to acquire Coatings from PPG Industries inside the United States to satisfy the Chashma 2 Contract;

7

  b.  Defendant **PPG PAINTS TRADING** outside of the United States would contact PPG Industries inside the United States, using e-mail and other forms of communication, to request orders for the Coatings called for under the Chashma 2 Contract;

  c.  Defendant **PPG PAINTS TRADING** would cause PPG Industries to export the Coatings from the United States to deliver to defendant **PPG PAINTS TRADING** in Shanghai, China, before causing the Coatings to be reexported or transshipped to Chashma 2, a PAEC nuclear power plant, without obtaining a license from the DOC, located in the District of Columbia;

  d.  To conceal the true end-user of the Coatings and to evade United States export controls, defendant **PPG PAINTS TRADING** would falsely state that the Coatings were to be used at a nuclear power plant in the People Republic of China (PRC), the export to which would not require a license from the DOC;

  e.  Defendant **PPG PAINTS TRADING** wired money from accounts outside of the United States to accounts of PPG Industries in the United States in payment for the purchased Coatings.

**Overt Acts**

  25.  In furtherance of this conspiracy, defendant **PPG PAINTS TRADING** and other co-conspirators, both known and unknown, committed overt acts, including but not limited to the following:

  a.  On or about June 15, 2006, defendant **PPG PAINTS TRADING** met with representatives of Company A and Company B and agreed upon an arrangement whereby **PPG PAINTS TRADING** could satisfy its obligations under the Chashma 2 Contract by selling the

8

Coatings to a third-party distributor in China, which, in turn, would sell the Coatings to Company A or Company B for application at Chashma 2 in Pakistan.

        b.      On or about June 20, 2006, Company C sent a purchase order to defendant **PPG PAINTS TRADING** for two shipments of Coatings intended for application at Chashma 2 -- namely, 160 gallons of KL65487107A, 40 gallons of KL65487107B, and 40 gallons of KL4093 in be delivered in the first shipment ("the First Shipment of Coatings"), and 80 gallons of KL65487107A, 20 gallons of KL65487107B, and 20 gallons of KL4093 to be delivered in the second shipment ("the Second Shipment of Coatings").   The purchase order falsely stated that the Coatings were to be used at "Dalian Shi Zi Kou Nuclear Power Station," a nuclear power plant purportedly under construction in the PRC the export of goods to which would not require a DOC license.

        c.      On or about June 21, 2006, defendant **PPG PAINTS TRADING** sent an e-mail purchase order to PPG Industries requesting the production of the First Shipment of Coatings and their delivery by airfreight to defendant **PPG PAINTS TRADING**.

        d.      On or about July 13, 2006, defendant **PPG PAINTS TRADING** sent an e-mail responded to an e-mail from PPG Industries requesting the end user for the First Shipment of Coatings.   In the e-mail, defendant **PPG PAINTS TRADING** falsely stated that the end user was "Da Lian Shi Zi Kou Nuclear Power Station."

        e.      At defendant **PPG PAINTS TRADING**'s request and direction, in or about July 2006, PPG Industries exported the First Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.

f.     On or about July 28, 2006, after the First Shipment of Coatings had arrived in Shanghai, defendant **PPG PAINTS TRADING** sent an e-mail to PPG Industries requesting certain shipping documents to facilitate getting "the goods ready for exporting. Once the documents are received, the goods will be good to go."

g.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** issued a "Sales Order Acknowledgement [sic]" to facilitate transfer of the First Shipment of Coatings to Company C.

h.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** issued a document entitled "Delivery Docket" to facilitate transfer of the First Shipment of Coatings to Company C .

i.     On or about July 31, 2006, Company C provided delivery instructions to defendant **PPG PAINTS TRADING** requesting the delivery of the First Shipment of Coatings to Company C by 5:00 p.m. on the same day and falsely stating that the goods were for use at the Dalian nuclear power plant.

j.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** billed Company C 146,240.01Chinese Yuan for the First Shipment of Coatings.

k.     On or about August 2, 2006, defendant **PPG PAINTS TRADING** received and deposited 146,240 Chinese Yuan from Company C in payment for the First Shipment of Coatings.   This payment was .01 Chinese Yuan less than the amount billed by defendant **PPG PAINTS TRADING** to Company C for the First Shipment of Coatings.

10

l.      On or about August 2, 2006, defendant **PPG PAINTS TRADING** billed Company C .01 Chinese Yuan for the arrearage in the amount of money Company C owed defendant **PPG PAINTS TRADING** for the First Shipment of Coatings.

m.      On or about August 7, 2006, defendant **PPG PAINTS TRADING** a purchase order by e-mail to PPG Industries requesting the production of the Second Shipment of Coatings.

n.      On or about August 15, 2006, defendant **PPG PAINTS TRADING** sent an e-mail responded to an e-mail from PPG Industries requesting the end-user for the Second Shipment of Coatings.   In the e-mail, defendant **PPG PAINTS TRADING** falsely stated that the end user was "Da Lian Shi Zi Kou Nuclear Power Station."

o.      At defendant **PPG PAINTS TRADING**'s request and direction, in or about September 2006,   PPG Industries exported the Second Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.

p.      On or about October 24, 2006, defendant **PPG PAINTS TRADING** issued a sales order acknowledgment to facilitate transfer of the Second Shipment of Coatings to Company C.

q.      On or about October 31, 2006, defendant **PPG PAINTS TRADING** billed Company C 69,019.99 Chinese Yuan for the Second Shipment of Coatings.

r.      On or about November 1, 2006, Company C provided delivery instructions to defendant **PPG PAINTS TRADING** for the Second Shipment of Coatings.

s.     On or about November 2, 2006, defendant **PPG PAINTS TRADING** issued a document entitled "Delivery Docket" to facilitate transfer of the Second Shipment of Coatings to Company C.

t.     On or about October 16, 2009, defendant **PPG PAINTS TRADING** received and deposited 69,020 Chinese Yuan from Company C in payment for the Second Shipment of Coatings.

u.     On or about October 23, 2006, defendant **PPG PAINTS TRADING** sent a purchase order by e-mail to PPG Industries requesting the production and shipment to defendant **PPG PAINTS TRADING** of 80 gallons of KL65487107, 20 gallons of KL65487107B, 75 gallons of KLD19140, 50 gallons of KLD1B, and 40 gallons of KL4093 ("the Third Shipment of Coatings"). In an e-mail accompanying that purchase order, defendant **PPG PAINTS TRADING** falsely stated to PPG Industries that the end user for the Third Shipment of Coatings was "Da Lian Shi Zi Kou Nuclear Power Station."

v.     At defendant **PPG PAINTS TRADING**'s request and direction, in or about December 2006, PPG Industries exported the Third Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.

w.     On or about January 26, 2007, defendant **PPG PAINTS TRADING** issued a sales order acknowledgment to facilitate transfer of the Third Shipment of Coatings to Company C.

x.     On or about December 18, 2006, defendant **PPG PAINTS TRADING** wired funds to PPG Industries which included a payment of $12,455.13 for the First Shipment of Coatings, and $1,965.74 for the Second Shipment of Coatings.

12

**(Conspiracy to Violate the International Emergency Economic Powers Act and the Export Administration Regulations,** in violation of Title 18, United States Code, Section 371; **Causing an Act to Be Done,** in violation of Title 18, United States Code, Section 2)

## COUNT TWO

26.     Paragraphs 1 through 21 of Count One of this Information are re-alleged as if fully set forth herein.

27.     On or about June 21, 2006, through on or about December 18, 2006, in the District of Columbia and elsewhere, defendant **PPG PAINTS TRADING** willfully exported, reexported, and transshipped, and attempted to export, reexport, and tranship 240 gallons of Coatings – namely, 160 gallons of KL65487107A, 40 gallons of KL65487107B, and 40 gallons of KL4093 – from the United States to Chashma 2 in Pakistan, via the PRC, knowing the Coatings were destined for Chashma 2, a PAEC nuclear power plant, without having obtained an export license from the United States Department of Commerce, located within the District of Columbia.

**(Unlawful Export or Attempted Export,** in violation of Title 50, United States Code, Sections 1705(a) and (c); Executive Order 13222; Title 15, Code of Federal Regulations, Supplement 4 to Part 744 and Section 764.2; **Causing an Act to Be Done,** in violation of Title 18, United States Code, Section 2.)

## COUNT THREE

28.     Paragraphs 1 through 21 of Count One of this Information are re-alleged as if fully set forth herein.

29.     On or about August 7, 2006, through on or about December 18, 2006, in the District of Columbia and elsewhere, defendant **PPG PAINTS TRADING** willfully exported, reexported, and transshipped, and attempted to export, reexport, and transship 120 gallons of

13

Coatings – namely, 80 gallons of KL65487107A, 20 gallons of KL65487107B, and 20 gallons of

KL4093 -- from the United States to Chashma 2 in Pakistan, via the PRC, knowing the Coatings

were destined for Chashma 2, a PAEC nuclear power plant, without first having obtained an

export license from the United States Department of Commerce, located within the District of

Columbia.

(**Unlawful Export or Attempted Export**, in violation of Title 50, United States Code, Sections
1705(a) and (c); Executive Order 13222; Title 15, Code of Federal Regulations, Supplement 4 to
Part 744 and Section 764.2; **Causing an Act to Be Done**, in violation of Title 18, United States
Code, Section 2.)

## COUNT FOUR

30.     Paragraphs 1 through 21 of Count One of this Information are re-alleged as if fully

set forth herein.

31.     On or about October 23, 2006, through on or about March 1, 2007, in the District

of Columbia and elsewhere, defendant **PPG PAINTS TRADING** willfully exported and

attempted to export, reexport, and transship 265 gallons of Coatings -- namely, 80 gallons of

KL65487107, 20 gallons of KL65487107B, 75 gallons of KLD19140, 50 gallons of KLD1B, and

40 gallons of KL4093 -- from the United States to Chashma 2 in Pakistan, via the PRC, knowing

the Coatings were destined for Chashma 2, a PAEC nuclear power plant, without first having

obtained an export license from the United States Department of Commerce, located within the

District of Columbia.

(**Unlawful Export or Attempted Export**, in violation of Title 50, United States Code, Sections
1705(a) and (c); Executive Order 13222; Title 15, Code of Federal Regulations, Supplement 4 to
Part 744 and Section 764.2; **Causing an Act to Be Done**, in violation of Title 18, United States
Code, Section 2.)

14

## FORFEITURE ALLEGATION

32.     The violations alleged in Counts One through Count Three of this Information are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

33.     As a result of the offenses alleged in Count One through Count Three of this Information, defendant shall forfeit to the United States any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in Count One through Count Three.   The property to be forfeited includes, but is not limited to, the following:

Money Judgment

a sum of money of at least $ 32,319, which represents a sum of money equal to property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the offenses alleged in Count One through Count Three of this Information.

By virtue of the commission of the felony offenses charged in Count One through Count Three of this Information, any and all interest that defendant has in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses is vested in the United States and hereby foreited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

34.     If, as a result of any act or omission of the defendant, the property identified above:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third person;

15

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property that cannot be subdivided
without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section
982(b)(1), incorporating by reference Title 21, United States Code,
Section 853(p), to seek forfeiture of any other property of the said
defendant up to the value of said property listed above as being
subject to forfeiture.

(Criminal Forfeiture, in violation of Title 18, United States Code, Section 981(a)(1)(C), and
Title 28, United States Code, Section 2461(c)).

Respectfully submitted,

_____
RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

_____
G. MICHAEL HARVEY
Assistant United States Attorney
D.C. Bar No. 447465
National Security Section
555 Fourth Street, NW (11th Floor)
Washington, D.C.     20530
(202) 252-7810
Michael.Harvey2@usdoj.gov

December _____, 2010

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | CRIMINAL NO. |
| v. | ) | |
| | ) | |
| PPG PAINTS TRADING (SHANGHAI) CO., | ) | |
| LTD. | ) | |
| | ) | |
| Defendant. | ) | |

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

Had this case gone to trial, the United States would have proven beyond a reasonable doubt that:

Beginning in or about June 2006, and continuing through in or about March 2007, within the District of Columbia and elsewhere, defendant **PPG PAINTS TRADING (SHANGHAI) CO., LTD. ("PPG PAINTS TRADING")**, did willfully conspire, confederate, and agree with others known and unknown, to violate the International Emergency Economic Powers Act ("IEEPA") and the Export Administration Regulations ("EAR") by causing the export, reexport and transshipment of certain PPG Industries, Inc. ("PPG Industries"), high performance coatings from the United States to the Chashma Nuclear Power Plant 2 ("Chashma 2") in Pakistan via the People's Republic of China, without obtaining the necessary license from the Department of Commerce, located in the District of Columbia.

The coatings at issue were manufactured and exported by PPG Industries in 2006.   In 2006, PPG Industries was a multinational, publicly-held United States corporation with its principal place of business and headquarters in Pittsburgh, Pennsylvania.   It was a major global manufacturer and supplier of chemicals, glass, fiberglass, and architectural, industrial and

performance coatings.   It had approximately 125 manufacturing facilities and equity affiliates in more than 20 countries and employed approximately 32,000 people worldwide.   PPG Industries' exports in 2006 were approximately $1 billion.   In 2006, PPG Industries' worldwide net sales totaled approximately $11 billion, of which in excess of $6 billion were for sales of coatings.

One part of PPG Industries' coatings line of products were its Keeler & Long ("K&L") brand of high performance coatings, manufactured at a PPG Industries' factory in Watertown, Connecticut, and produced for use on applications associated with the power industry and other industrial applications.   One type of K&L brand high performance coating was an epoxy-based paint system designed to withstand the severe environmental conditions within the primary containment area of a nuclear reactor, an area commonly referred to as the reactor's "Level 1 area."   In the United States, ASTM International ("ASTM") develops and publishes standards for Level 1 coatings.   The K&L Level 1 paint system has been tested and certified as meeting the ASTM Level 1 standard.   To reflect the fact that the paint system satisfies these ASTM standards, a unique Level 1 product code was assigned for each of the coatings, and each batch of the Level 1 coatings is accompanied by a Certificate of Assurance ("COA") that certifies that the coatings were made using the same procedure and formula as the coatings that satisfied the ASTM tests.   The Level 1 product codes for the Level 1 coatings at issue ("the Coatings") are as follows:   a two-part epoxy base coat (product codes KL65487107A and KL65487107B), a two-part epoxy top coat (product code KLD19140 and KLD1B), and a thinner, or solvent (product code KL4092).

The Coatings were exported from the United States in 2006 at the request of defendant **PPG PAINTS TRADING**.   Defendant **PPG PAINTS TRADING** was a wholly-owned

2

subsidiary of PPG Industries.   It was a Chinese corporation with its principal place of business in Shanghai, China.   Defendant **PPG PAINTS TRADING** was engaged in the business of importing and exporting architectural, refinish, industrial and packaging coatings on behalf various PPG Industries business units.

### Relevant Legal Authorities

The parties agree that for purpose of this plea and factual proffer that the relevant law is set forth accurately in the Information.   To summarize, the United States Department of Commerce ("DOC"), located in the District of Columbia, was responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries and entities.   The DOC implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730–774, which were in effect pursuant to provisions of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706, by virtue of Presidential Executive Order 13222 and successive Presidential notices and orders.

Through the EAR, the DOC authorized the exportation of goods and technology to restricted countries and foreign end-users through the issuance of a license.   Any export or reexport of goods from the United States to a restricted country or foreign end-user without such a license was a violation of the EAR.   DOC's Bureau of Industry and Security ("BIS") published a list of prohibited individuals or entities (the "Entity List") found in Supplement No. 4 to Part 744 of the EAR.   Individuals or entities were placed on the Entity List by BIS because they had engaged in activities that could result in an increased risk of diversion of exported, reexported and transferred items to weapons of mass destruction programs, to activities sanctioned by the State Department, or to activities contrary to United States national security and/or foreign policy interests.

3

The Pakistan Atomic Energy Commission ("PAEC") was the science and technology organization in Pakistan responsible for, among other things, Pakistan's nuclear program, including the development and operation of nuclear power plants in Pakistan.   In or about November 1998, following Pakistan's first successful detonation of a nuclear device, BIS added the PAEC, as well as the PAEC's subordinate nuclear reactors and power plants, to the Entity List.   As a restricted end-user, a United States manufacturer seeking to export, reexport or transship any items subject to the EAR to the PAEC or its nuclear power plants or reactors would need first to obtain a license from DOC in the District of Columbia.

In, 2006, the Chashma Nuclear Power Plant 2 ("Chashma 2") was a PAEC nuclear power plant under construction near Kundian, Punjab province, Pakistan.   Because it is a PAEC nuclear power plant, export, reexport or transshipment of any items subject to the EAR to Chashma 2 would require a license from the DOC.   The Coatings at issue were items subject to the EAR and fell within the jurisdiction of the DOC.

### Relevant Entities

Company A was a Chinese construction company specializing in overseas nuclear and civil engineering project management.   Company A was the general contractor responsible for the construction of Chashma 2 for the PAEC.

Company B was a Chinese construction company specializing in nuclear engineering, municipal engineering, fire engineering, road engineering, and steel structure engineering. Company B was a subcontractor working for Company A on the construction of Chashma 2. Company B was responsible for applying coatings at Chashma 2.

Company C was a Chinese distributor of coatings located in Shanghai, China.

4

### PPG PAINTS TRADING's Chashma 2 Contract

In or about December 2005, defendant **PPG PAINTS TRADING** entered a contract with Company B for defendant **PPG PAINTS TRADING** to supply the Coatings for application by Company B at Chashma 2 ("Chashma 2 Contract"). The contract contained a liquidated damages clause if there were any delayed shipments under the contract. Because Chashma 2 was a PAEC facility, on or about January 20, 2006, PPG Industries submitted a license application to DOC in the District of Columbia for authorization to export the Coatings for application at Chashma 2.

On or about June 8, 2006, PPG Industries was informed that its license application would be denied by DOC. On or about June 9, 2006, PPG Industries notified defendant **PPG PAINTS TRADING** that it must abide by the ruling of the DOC to deny the license and instructed defendant **PPG PAINTS TRADING** to advise Company B that it could not provide the Coatings to Company B. In response, on or about June 9, 2006, defendant **PPG PAINTS TRADING** informed PPG Industries that it had informed Company B that it could not provide the Coatings.

### The Conspiracy

In fact, on or about June 15, 2006, defendant **PPG PAINTS TRADING** met with representatives of Company A and Company B and agreed upon an arrangement whereby **PPG PAINTS TRADING** could satisfy its obligations under the Chashma 2 Contract by selling the Coatings to Company C, a third-party distributor in China, which, in turn, would sell the Coatings to Company A or Company B for application at Chashma 2 in Pakistan. The goal of involving the third-party Chinese distributor was to structure the transaction so as to conceal the true end-user of the Coatings from the United States, thereby evading the prohibitions and

5

licensing requirements of the IEEPA and the EAR, and avoiding breach of the Chashma 2 Contract.

These facts were reported to counsel for PPG Industries (who, in turn, reported them to the United States at PPG Industries' direction) by an individual who worked at the high performance coating business unit at **PPG PAINTS TRADING** responsible for the sale of the Coatings and who was involved in the conspiracy ("Employee A").   Employee A explained that the **PPG PAINTS TRADING** employees involved in the conspiracy were aware of the need for the DOC license for the Coatings shipments and of the denial of the license application by DOC in June 2006.   Further, Employee A identified Company C as the third-party Chinese distributor used by **PPG PAINTS TRADING** to facilitate delivery of the Coatings under the Chashma 2 Contract after the denial of the license in June 2006.   Employee A did not indicate that PPG Industries' employees were aware of the arrangement, and suggested that **PPG PAINTS TRADING** employees involved in the post-license shipments sought to conceal the true nature of the post-license shipments to Chashma 2 from PPG Industries.

Employee A's statements concerning post-license shipments to Chashma 2 were corroborated by PPG Industries and **PPG PAINTS TRADING** records provided by PPG Industries during the investigation, which included the following:

a.    On or about June 20, 2006, Company C sent a purchase order to defendant **PPG PAINTS TRADING** for two shipments of same type of coatings called for in **PPG PAINTS TRADING's** Chashma 2 Contract, namely 160 gallons of KL65487107A, 40 gallons of KL65487107B, and 40 gallons of KL4093 in the first shipment to be delivered by air freight ("the First Shipment of Coatings"), and 80 gallons of KL65487107A, 20 gallons of KL65487107B, and 20 gallons of KL4093 in the second shipment to be delivered by sea freight

6

("the Second Shipment of Coatings").   The purchase order falsely stated that the Coatings were to be used at "Dalian Shi Zi Kou Nuclear Power Station," a nuclear power plant purportedly under construction in China the export of goods to which would not require a DOC license. Publicly available information indicates that in June 2006, there was no nuclear power plant at Dalian Shi Zi Kou that would require   Level 1 coatings.

        b.      On or about June 21, 2006, defendant **PPG PAINTS TRADING** sent a purchase order to PPG Industries requesting the production of the First Shipment of Coatings and their delivery by airfreight to defendant **PPG PAINTS TRADING**.

        c.      On or about July 13, 2006, defendant **PPG PAINTS TRADING** responded to an email from PPG Industries requesting the end user for the First Shipment of Coatings.   Defendant **PPG PAINTS TRADING** falsely stated that the end user was "Da Lian Shi Zi Kou Nuclear Power Station."

        e.  · At defendant **PPG PAINTS TRADING**'s request and direction, in or about July 2006, PPG Industries exported the First Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.   This First Shipment of Coatings forms the basis for Count II of the Information charging **PPG PAINTS TRADING** with an Unlawful Export or Attempted Export in violation of IEEPA and the EAR.

        f.      On or about July 28, 2006, after the First Shipment of Coatings had arrived in China, defendant **PPG PAINTS TRADING** sent an e-mail to PPG Industries requesting certain shipping documents to facilitate getting "the goods ready for exporting. Once the documents are received, the goods will be good to go."

g.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** issued a "Sales Order Acknowledgement [sic]" to facilitate transfer of the First Shipment of Coatings to Company C.

h.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** issued a document entitled "Delivery Docket" to facilitate transfer of the First Shipment of Coatings to Company C .

i.     On or about July 31, 2006, Company C provided delivery instructions to defendant **PPG PAINTS TRADING** requesting the delivery of the First Shipment of Coatings to Company C by 5:00 p.m. on the same day and falsely stating that the goods were for use at the Dalian nuclear power plant.

j.     On or about July 31, 2006, defendant **PPG PAINTS TRADING** billed Company C 146,240.01Chinese Yuan for the First Shipment of Coatings.

k.     On or about August 2, 2006, defendant **PPG PAINTS TRADING** received and deposited 146,240 Chinese Yuan from Company C in payment for the First Shipment of Coatings.   This payment was .01 Chinese Yuan less than the amount billed by defendant **PPG PAINTS TRADING** to Company C for the First Shipment of Coatings.

l.     On or about August 2, 2006, defendant **PPG PAINTS TRADING** billed Company C .01 Chinese Yuan for the arrearage in the amount of money Company C owed defendant **PPG PAINTS TRADING** for the First Shipment of Coatings.

m.     On or about August 7, 2006, defendant **PPG PAINTS TRADING** sent a purchase order to PPG Industries requesting the production of the Second Shipment of Coatings.

n.     On or about August 15, 2006, defendant **PPG PAINTS TRADING** responded to an email from PPG Industries requesting the end user for the Second Shipment of

8

Coatings.   Defendant **PPG PAINTS TRADING** falsely stated that the end user was "Da Lian Shi Zi Kou Nuclear Power Station."

      o.     At defendant **PPG PAINTS TRADING**'s request and direction, in or about September 2006, PPG Industries exported the Second Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.   This Second Shipment of Coatings forms the basis for Count III of the Information charging **PPG PAINTS TRADING** with an Unlawful Export or Attempted Export in violation of IEEPA and the EAR.

      p.     On or about October 24, 2006, defendant **PPG PAINTS TRADING** issued a sales order acknowledgment to facilitate transfer of the Second Shipment of Coatings to Company C.

      q.     On or about October 31, 2006, defendant **PPG PAINTS TRADING** billed Company C 69,019.99 Chinese Yuan for the Second Shipment of Coatings.

      r.     On or about November 1, 2006, Company C provided delivery instructions to defendant **PPG PAINTS TRADING** for the Second Shipment of Coatings.

      s.     On or about November 2, 2006, defendant **PPG PAINTS TRADING** issued a document entitled "Delivery Docket" to facilitate transfer of the Second Shipment of Coatings to Company C.

      t.     On or about October 16, 2009, defendant **PPG PAINTS TRADING** received and deposited 69,020 Chinese Yuan from Company C in payment for the Second Shipment of Coatings.

      u.     On or about October 23, 2006, defendant **PPG PAINTS TRADING** sent a purchase order to PPG Industries requesting the production and shipment to defendant **PPG PAINTS TRADING** of same type of coatings called for in **PPG PAINTS TRADING**'s

Chashma 2 Contract, namely 80 gallons of KL65487107, 20 gallons of KL65487107B, 75 gallons of KLD19140, 50 gallons of KLDB9140, and 40 gallons of KL4093 ("the Third Shipment of Coatings").   In an e-mail accompanying that purchase order, defendant **PPG PAINTS TRADING** falsely stated that the end user for the Third Shipment of Coatings was "Da Lian Shi Zi Kou Nuclear Power Station."

        v.      At defendant **PPG PAINTS TRADING's** request and direction, in or about December 2006, PPG Industries exported the Third Shipment of Coatings from the United States to defendant **PPG PAINTS TRADING** in Shanghai, China.   This Third Shipment of Coatings forms the basis for Count IV of the Information charging **PPG PAINTS TRADING** with an Unlawful Export or Attempted Export in violation of IEEPA and the EAR.

        w.      On or about January 26, 2007, defendant **PPG PAINTS TRADING** issued a sales order acknowledgment to facilitate transfer of the Third Shipment of Coatings to Company C.

        x.      On or about December 18, 2006, defendant **PPG PAINTS TRADING** wired funds to PPG Industries which included a payment of $12,455.13 for the First Shipment of Coatings, and $1965.74 for the Second Shipment of Coatings.

     In January 2007, following the statements of Employee A to PPG Industries, PPG Industries ordered **PPG PAINTS TRADING** not to sell or transfer the Third Shipment of Coatings.   The Third Shipment of Coatings were then returned to the United States before reaching Pakistan, and turned over to BIS custody.

     In or about March 2007, following PPG Industries halt of the Third Shipment of Coatings, Company B sent notification to **PPG PAINTS TRADING** claiming **PPG PAINTS TRADING's** unilateral breach of the Chashma 2 Contract.

At no time did the defendant **PPG PAINTS TRADING** receive or possess a license or authorization from the DOC to export, reexport or transship the Coatings from the United States to Chashma 2.   At all relevant times hereto, **PPG PAINTS TRADING** knew that the Coatings exported from the United States were destined for Chashma 2.

The proceeds obtained, directly or indirectly, as the result of the offenses alleged in Count One through Count Three of the Information were $32,319.

### Limited Nature of Factual Proffer in Support of Guilty Plea

This factual proffer is not intended to constitute a complete statement of all facts known by the United States, but is intended to provide the necessary factual predicate for defendant **PPG PAINTS TRADING's** plea of guilty to Counts I through IV of the Information.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY


G. MICHAEL HARVEY (D.C. Bar No. 447465)
JOHN BORCHERT (D.C. Bar No. 472-824)
Assistant United States Attorneys
National Security Section
555 Fourth Street, NW (11th Floor)
Washington, D.C. 20530
(202) 252-7810 (Harvey)
(202) 252-7811 (Borchert)
Michael.Harvey2@usdoj.gov
John.Borchert@usdoj.gov


December _____, 2010

11

## Defendant's Stipulation and Signature

I am authorized to act on behalf of defendant PPG Paints Trading (Shanghai) Co., Ltd., in this matter.

On behalf of defendant PPG Paints Trading (Shanghai) Co., Ltd., after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above proffer of facts is true and accurate.   I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

PPG Paints Trading (Shanghai) Co., Ltd.

Date: _____                _____
                                      VIKTORAS RIMAS SEKMAKAS

## Attorney's Acknowledgment

I am counsel for defendant PPG Paints Trading (Shanghai) Co., Ltd., I have carefully reviewed the above proffer of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

Date: _____                _____
                                      ROBERT N. DRISCOLL, ESQ.
                                      Attorney for PPG Paints Trading (Shanghai) Co., Ltd.

12